UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICIA BRADLEY,

    Plaintiff,                        Civil Action No. 18-13679

        v.                         District Judge DAVID M. LAWSON
                                          Magistrate Judge R. STEVEN WHALEN

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Patricia Bradley ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act. The parties have filed cross-motions for summary judgment. Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment [Docket #18] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #13] be DENIED.

## PROCEDURAL HISTORY

On January 20, 2016, Plaintiff applied for DIB, alleging disability as of July 1, 2015 (Tr. 202). Following the initial denial of benefits, Plaintiff requested an administrative hearing, held on December 15, 2017 in Detroit, Michigan (Tr. 51). Lauren G. Burstein, Administrative Law Judge ("ALJ") presided. Plaintiff, represented by attorney Andrea Hamm, testified (Tr. 57-81), as did Vocational Expert ("VE") Harry Cynowa (Tr. 55-57, 81-85). On March 23, 2018, ALJ Burstein found Plaintiff not disabled from July 1, 2015 through the date of the decision (Tr. 30-46). On October 12, 2018, the Appeals Council denied review (Tr. 1-4). Plaintiff filed suit in this Court on November 26, 2018.

## BACKGROUND FACTS

Plaintiff, born January 22, 1978, was 40 when ALJ Burstein issued her decision (Tr. 46, 202). She received a GED and worked as a telemarketer (Tr. 261-262). She alleges disability as a result of anxiety, bipolar disorder, Post Traumatic Stress Disorder ("PTSD"), anti-social personality disorder, and back pain (Tr. 260).

### A. Plaintiff's Testimony

Plaintiff offered the following testimony.

She lived in a single-family home with her daughter, 18, and grandson, seven months (Tr. 57-58). Her daughter attended online high school (Tr. 58). Her daughter's boyfriend took care of the baby during the day, but Plaintiff occasionally changed the baby's diaper and performed other childcare activities (Tr. 59).

Plaintiff left school after ninth grade but later received a GED (Tr. 59). She did not have vocational training (Tr. 59). She received food stamps and medical care from the state but was otherwise supported by her daughter and the daughter's boyfriend (Tr. 59). She had not worked in two-and-a-half years (Tr. 59). She lost her most recent long-term job due to losing her temper at work (Tr. 59). She had attempted to secure a job since then, but was stymied by her criminal record and short attention span (Tr. 60). At the time of the hearing, she was still seeking work (Tr. 60). During 2015, she worked for two weeks as a telemarketer but was unable to continue due her short attention span (Tr. 60). She was terminated from a job as a waitress after two weeks after losing her temper with a customer (Tr. 61).

Plaintiff believed that she was unable to work due to depression, bipolar, a mood disorder, and her temper (Tr. 63). She took prescribed medication but did not trust therapists since a therapist had "tried to lock [her] up" (Tr. 63). She experienced reduced psychological symptoms with medication (Tr. 63). Due to depression, she was bed bound and suicidal around three days a week, adding that in addition to the above-listed conditions, she also experienced schizophrenia (Tr. 64).

In addition to Plaintiff's psychological limitations, she experienced a dislocated elbow, torn ligaments, and Chronic Obstructive Pulmonary Disease ("COPD") (Tr. 64). Due to the elbow problems, she was unable to lift more than a gallon of milk (Tr. 64). The COPD was exacerbated by cold air, overexertion, and dust (Tr. 64). She spent most her waking

hours at home watching television and talking to her daughter (Tr. 64). She experienced the medication side effects of dry mouth and "twitches" (Tr. 65). She was able to take care of her personal needs (Tr. 65). She had not driven since receiving a DUI (Tr. 65). She relied on her mother or others for transportation (Tr. 65). She was unable to navigate public transportation due to a poor sense of direction (Tr. 65). She grocery shopped once a month with the help of her daughter, cooked occasionally, and was able to perform household and laundry chores (Tr. 66). She did not perform yard work (Tr. 66). Her sleep schedule depending on whether she was in a manic or depressed state (Tr. 66). She denied the use of alcohol or recreational drugs in the past four years (Tr. 67). She acknowledged that she had been found to be violating her narcotics contract with a treating source approximately nine months before the hearing (Tr. 67). She received six months inpatient treatment for alcohol abuse over five years before the hearing (Tr. 67). She smoked cigarettes (Tr. 67).

 In response to questioning by her attorney, Plaintiff reported that her manic episodes lasted between three to five days at which time she did "everything," including cleaning, cooking, and scrubbing walls and bathrooms (Tr. 68). During manic periods, she did not sleep for days at a time (Tr. 68). While she took Trazodone for mood swings every day, the medication did not always quell manic symptoms (Tr. 68). She took Lamictal during manic phases (Tr. 69). She experienced one to two manic episodes every month (Tr. 69). She also took Abilify and Celexa for depression (Tr. 69). She sometimes needed reminders to take her medication, shower, change clothes, and do laundry (Tr. 69). Her daughter had lived

with her since birth (Tr. 70). Plaintiff's boyfriend typically helped with household chores twice a week (Tr. 70-71). Plaintiff had attempted suicide twice and was once hospitalized after an attempt (Tr. 71). She either called a suicide hotline or went "straight to the hospital" for suicidal ideation (Tr. 71). She lacked the focus to follow a 30-minute television show, noting that she could concentrate for only 15 minutes at a time (Tr. 72). Her psychological condition had "traumatically dropped" since a 2012 denial of DIB on an earlier application (Tr. 73). She now experienced more frequent and intense manic episodes (Tr. 74). She experienced no improvement with psychological therapy (Tr. 74). She saw a doctor for a medication review once a month (Tr. 75). She experienced elbow problems since sustaining injuries on Christmas day, 2016 (Tr. 75). She attended physical therapy but was told that she had reached maximum improvement (Tr. 75). On a scale of one to ten, her elbow pain was a "ten" (Tr. 76). The pain was exacerbated by the cold (Tr. 76). She also experienced long-term back pain characterized by muscle spasms on the left brought on by sitting for more than 30 minutes (Tr. 77). She was unable to stand for more than 20 minutes at a time due to lower extremity numbness (Tr. 77). She fell three months before the hearing when her legs "gave out" (Tr. 78). She experienced lifting limitations on the left due the elbow condition and on the right due to Carpal Tunnel Syndrome ("CTS") (Tr. 78). She also experienced gripping problems on the right and took Norco twice a day (Tr. 78). She denied side effects from Norco and reported that the medication reduced her hand and lower back pain (Tr. 79). Surgery had not been recommended for any of her conditions (Tr. 79). She was unable to

walk more than half a block due to both back problems and COPD (Tr. 79). She took albuterol treatments twice a day for COPD and carried an asthma inhaler (Tr. 79). Plaintiff required three breathing treatments a day for about 15 days a month (Tr. 80). Her most comfortable position was sitting on the floor tilted to one side (Tr. 80).

### B. Medical Evidence

#### 1. Treating Sources[1]

Muhammad Wasiullah, M.D. noted in August, 2015 that Plaintiff demonstrated normal muscle strength and coordination despite reports of back pain (Tr. 511-512). Dr. Wasiullah's March, 2016 records note full strength in all muscle groups (Tr. 595). Plaintiff reported good results with the use of pain medication (Tr. 595). May, 2016, records also note full muscle strength (Tr. 573). The following month, Plaintiff reported good pain control with medication (Tr. 568). July, 2016 records note Plaintiff's report of back pain (Tr. 583). Plaintiff appeared fully oriented, well groomed, and cooperative with full orientation (Tr. 583). October and December, 2016 records note full muscle strength and the absence of neurologic signs (Tr. 535, 544). In December, 2016, Plaintiff sought treatment for a left elbow injury (Tr. 524). She appeared fully oriented (Tr. 525). She was diagnosed with an elbow dislocation (Tr. 525). She was prescribed Norco and advised to ice the elbow (Tr. 526). Followup records from March, 2017 note "no episodes of instability" and only mild

---

[1] Records created before the July 1, 2015 alleged onset of disability, while reviewed in full, are omitted from the present discussion.

range of motion limitation (Tr. 531).

In January, 2017, Plaintiff sought emergency treatment for chest pain (Tr. 675). Imaging studies of the chest were unremarkable (Tr. 675). February, 2017 records by Dr. Wasiullah note Plaintiff's report of continued anxiety, bipolar disorder, and insomnia (Tr. 553). A March, 2017 CT of the chest showed unremarkable results (Tr. 608). The same month, Dr. Wasiullah dismissed Plaintiff on the basis that she had violated the terms of her narcotic medication contract (Tr. 598). May, 2017 records by Steven Lis, D.O. note Plaintiff's denial of shortness of breath (Tr. 665). Plaintiff denied chest pain (Tr. 665). Dr. Lis noted imaging studies showing a nodule of the lung (Tr. 665). Plaintiff reported anxiety but exhibited a normal mood, affect, and behavior (Tr. 666). The following month, Dr. Lis prescribed inhaler treatment for COPD (Tr. 664). An August, 2017 CT of the thorax showed benign nodules unchanged from an October, 2015 study (Tr. 684). August, 2017 records again note a normal mood and affect (Tr. 659). Plaintiff denied chest tightness or shortness of breath (Tr. 659). October, 2017 records for evaluation of the left elbow note that Plaintiff was a "half-pack" a day smoker and used alcohol (Tr. 633). Plaintiff reported physical therapy for her back pain was not "helping much" (Tr. 653).

### 2. Non-Treating Sources

In June, 2016, psychologist Hugh D. Bray, Ph.D. performed a mental status evaluation on behalf of the SSA, noting Plaintiff's report of bipolar disorder characterized by being alternatively "super excited" and unable to get out of bed; anxiety with panic attacks while

driving and in social situations; and anti-social personality disorder with a bad temper (Tr. 516). Plaintiff reported inpatient treatment in 2015 after making a suicide attempt (Tr. 517). She noted racing thoughts and sleep disturbances (Tr. 518).

Dr. Bray noted normal grooming, posture, and gait (Tr. 519). Plaintiff's thought process was normal with a depressed mood (Tr. 519). She reported auditory hallucinations "every so often" \(Tr. 519). She appeared fully oriented (Tr. 519). Dr. Bray gave her a poor prognosis, noting that she needed "to be in mental health treatment" and continue the use of psychotropic medications (Tr. 520-521). He found significant impairment in social functioning and moderate impairment in concentration (Tr. 521).

In May, 2016, Reuben Henderson, D.O., performed a non-examining review of the treating and consultative records, finding that Plaintiff could lift 20 pounds occasionally and 10 frequently; run, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation (Tr. 121). Dr. Henderson found that Plaintiff was precluded from the use of ladders, ropes, or scaffolds and was required to avoid all exposure to airborne pollutants and hazards such as machinery and heights (Tr. 122). In July, 2016, Blaine Pinaire, Ph.D. also performed a non-examining review of the treating and consultative records, finding mild limitation in activities of daily living and moderate limitation in social functioning and maintaining concentration, persistence, or pace (Tr. 118).

### C. Vocational Expert Testimony

VE Cynowa classified Plaintiff's past relevant work as a telemarketer as semiskilled and exertionally sedentary and work as a retail attendant, unskilled/exertionally light[2] (Tr. 81). ALJ Burstein then posed the following question to the VE, describing a hypothetical individual of Plaintiff's age, education, work experience:

> [A]ssume that this individual is limited to light work, can frequently use hand controls, handle, finger and feel. Can occasionally climb ramps and stairs, can never climb ladders, ropes and scaffolds. Should avoid hazards such as unprotected heights and hazardous machinery. Should avoid exposure to excessive vibrations, requires a clean air environment with stable temperatures and low levels of pulmonary irritants, and is further limited to simple, routine and repetitive tasks performed in an SVP 1 or 2,[3] must be free of fast-paced production requirements with few, if any, work place changes and only simple work-related decisions . . . able to interact occasionally with supervisors and coworkers but must avoid tandem tasks and working with the public. Can this individual perform any of claimant's past work? (Tr. 81-82).

The VE testified that the above limitations would preclude Plaintiff's past work but would allow for the exertionally light, unskilled work of a hand packer (at least 80,000

---

[2] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

[3] Both Specific Vocational Preparation ("SVP") 1 and 2 are classified as unskilled work. SSR 00–4p, 2000 WL 1898704, *3 (December 4, 2000).

positions in the national economy); assembler (80,000); and visual inspector (80,000) (Tr. 82). The VE testified further that if the above limitations were amended to limit the individual to *sedentary* work, the individual could work as a bench hand (100,000); clerical sorter (80,000); and security monitor (120,000) (Tr. 83). The VE stated that if the above-described individual were required to miss three days of work each month due to psychological symptoms, no competitive full-time employment would be available (Tr. 51).

In response to questioning by Plaintiff's counsel, the VE testified that the need to be off task for 15 percent of the workday due to the need to use an inhaler, or, the need to work in total isolation would be work preclusive (Tr. 83-84). The VE stated that his testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*") except for the testimony regarding time off task, absenteeism, and working in isolation which was based on his own professional experience (Tr. 84).

### D. The ALJ's Decision

ALJ Burstein prefaced her findings by noting that she adopted the September 7, 2012 findings in an earlier application for DIB, "except where new and material evidence justifie[d] a finding different" from the former determination[4] (Tr. 31, 86-101). Then, citing

---

[4]

Plaintiff does not dispute the ALJ Burstein's finding that evidence created since the 2012 determination justified the finding of additional severe impairments or that at least two of the formerly severe impairments were non-severe (Tr. 33-34). While Plaintiff takes issue with the ALJ's weighing of the various sources and the RFC for light work, she does not dispute the finding that evidence created subsequent to the 2012 decision demonstrated a material change in her condition. Therefore, the 2012 findings, while reviewed, are not included in the present discussion.

the medical records, she found that between the relevant period between July 1, 2015 and March 23, 2018, Plaintiff experienced the severe impairments of "status-post elbow dislocation; back pain; obesity; [COPD]; bipolar disorder; antisocial personality disorder; anxiety; and [PTSD]" but that none of the conditions met or medically equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 33-34). She found that the conditions of alcohol abuse, vitamin D deficiency, and iron deficiency anemia were non-severe (Tr. 34). She found that Plaintiff experienced mild limitation in understanding, remembering, or applying information and adapting or managing herself, but moderate limitation in interacting with others and concentration, persistence, or pace (Tr. 35-36).

The ALJ found that Plaintiff retained the residual functional capacity ("RFC") for light work with the following additional limitations:

> [F]requently use hand controls, handle, finger, and feel; can occasionally climb ramps and stairs and never climb ladders, ropes, and scaffolds; should avoid hazards such as unprotected heights and hazardous machinery; should avoid exposure to excessive vibrations; requires a clean-air environment with stable temperatures and low levels of pulmonary irritants; and is further limited to simple, routine, and repetitive tasks performed at specific vocational preparation (SVP) 1 or 2; must be free of fast-paced production requirements with few, if any workplace changes; and only simple work-related decisions; able to interact occasionally with supervisors and coworkers but must avoid tandem tasks and working with the public (Tr. 37).

Citing the VE's testimony, the ALJ found that Plaintiff could work as a hand packager, small products assembler, and visual inspector (Tr. 46, 82).

The ALJ discounted the allegations of psychological and physical disability, noting that "the evidence does not reflect the mood volatility or temper" that Plaintiff alleged at the hearing (Tr. 40). She observed that Dr. Wasiullah's treating records included "no clinical evidence of attention, concentration, or thought process abnormalities" (Tr. 40). She noted that Plaintiff's recent treating records reflected a normal mood, affect, and behavior (Tr. 40). She observed that "the only clinical indication of mood or behavioral abnormalities occurred during the psychological consultative exam where [Plaintiff] appeared distant, suspicious, anxious, depressed, tearing up, and crying" (Tr. 40). As to the allegations of physical restriction, the ALJ found that as of March, 2017, Plaintiff's December, 2016 elbow injury had improved with "no recurrent episodes of instability" (Tr. 39). The ALJ cited April, 2017 records showing full muscle strength in all extremities (Tr. 40). Despite Plaintiff's allegation of the medication side effect of "twitching," the ALJ noted that treating records showed that Plaintiff did not experience such side effects any time within the two years before the alleged onset date (Tr. 41). Despite claims of chronic shortness of breath and the need for an inhaler, the ALJ noted that Plaintiff denied shortness of breath at multiple exams (Tr. 41).

### III. STANDARD OF REVIEW

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, — U.S. —, 139 S.Ct. 1148, 1154 (2019)(punctuation altered)(*citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed.

126 (1938))(emphasis deleted). The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. *Biestek* at 1152; 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(*citing Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.1994)).

The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(*en banc*). Where substantial evidence supports the ALJ's decision, the reviewing court "defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Commissioner Of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)(*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)). However, in determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Her v. Commissioner of Social Sec.*, 203 F.3d 388, 391–92 (6th Cir. 1999).

## ANALYSIS

### The Residual Functional Capacity ("RFC")

In support of remand, Plaintiff takes issue with the RFC for a limited range of exertionally light work. ECF No. 13, PageID.755.  She contends that the RFC crafted by the ALJ is both unsupported by the record, *id.,* and does not meet the articulation requirements of SSR 96-8p.  ECF No.13, PageID 759.

"RFC is what an individual can still do despite his or her limitations." SSR 96-8p, 1996 WL 374184 at *2. (July 2, 1996). "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts" including objective findings, non-medical evidence, and activities of daily living. *Id.* at *7. The analysis must include the alleged psychological and physical limitations. 20 C.F.R. §§ 404.1545, 416.945.

In crafting the RFC, the ALJ's findings must include consideration of the exertional activities of "sitting, standing, walking, lifting, carrying, pushing, [and] pulling" as well as the non-exertional physical limitations and how the psychological limitations affect the ability to "understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p at *5-6. "Although a function-by-function analysis is desirable, SSR 96–8p does not require ALJs to produce such a detailed statement in writing." *Delgado v. Comm'r Social Security*, 30 Fed.Appx. 542, 547–548, 2002 WL 343402, at *5 (6th Cir. March 4, 2002)(internal citations omitted). "[T]he ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Id.*

As set forth verbatim, *above,* pg. 11, the ALJ found that Plaintiff was capable of exertionally light work with postural, manipulative, and environmental limitations (Tr. 37). As to the psychological limitations, the ALJ limited Plaintiff to unskilled work consisting of "simple, routine, and repetitive tasks" with a preclusion on "fast-paced production;" only rare "workplace changes;" "only simple work-related decisions;" occasional interaction with supervisors and coworkers with avoidance of "tandem tasks;" and a preclusion on working with the public (Tr. 37).

As a threshold matter, Plaintiff's claim that the ALJ was required adopt verbatim the findings of one medical source or another is without merit. It is well settled that determination of the RFC "is expressly reserved for the Commissioner." *Edwards v. Commissioner of Social Security*, 97 Fed.Appx. 567, 569, 2004 WL 959480, at *1 (May 3, 2004); 20 C.F.R. §§ 404.1527(e)(2). The fact that the ALJ drew on a number of sources in crafting the RFC does not constitute grounds for remand. Moreover, the ALJ provided a thorough rationale for declining to adopt any of the medical opinions in their entirety and instead according partial weight to the various consultative and non-examining sources (Tr. 42-43).

Notably, as to Dr. Henderson's non-examining finding that Plaintiff could perform a range of exertionally light work, the ALJ found that the record as a whole supported a *greater* degree of non-exertional limitation, adding manipulative limitations to the RFC (in consideration of the non-severe impairment of CTS) and additional environmental limitations

based on Plaintiff's more recent diagnosis of COPD (Tr. 37, 42, 122). As to the December, 2016 elbow injury, the ALJ noted that as of March, 2017, Plaintiff denied elbow instability (Tr. 39). The ALJ cited the treating records showing full strength in all extremities (Tr. 39). As to the allegations of back pain, the ALJ noted that the imaging studies did not support Plaintiff's claim that she was unable to walk or stand for more than short periods and that her legs "gave out" (Tr. 38). She noted that Plaintiff demonstrated consistently full strength and a normal gait (Tr. 39). The ALJ cited Plaintiff's own statement to her treating source that the back pain was controlled with medication (Tr. 39). The ALJ properly rejected a September, 2013 "disability" finding by a treating source on the basis that the assessment was made almost two years before the July 1, 2015 alleged onset of disability and unaccompanied by "corresponding physical diagnoses"[5] (Tr. 42, 468). Notably, none of Plaintiff's treating providers for the relevant period found that she was physically incapable of performing work within the RFC crafted by the ALJ.

As to the evidence regarding Plaintiff's psychological condition, the ALJ accorded partial weight to Dr. Pinaire's non-examining assessment by adopting his limitation to unskilled work but noting that Plaintiff was additionally limited to work not involving "fast-paced production requirements," or "new, if any, workplace changes" (Tr. 43, 118). While

---

[5]While the September, 2013 assessment states that Plaintiff was incapable of lifting even "less than 10 pounds," she did not require assistance in performing household, shopping, or laundry activities, all of which would require lifting to some degree (Tr. 468-469).

-17-

Plaintiff faults the ALJ for failing to adopt any one medical opinion in its entirety, the RFC actually contains a more restrictive RFC than supported by Dr. Pinaire's assessment (Tr. 37).

In contrast, the ALJ accorded partial weight to Dr. Bray's consultative finding on the basis that his "poor" prognosis was "not representative" of Plaintiff's "longitudinal functioning" (Tr. 43). While the ALJ adopted Dr. Bray's finding that Plaintiff was limited to "simple, repetitive tasks," she noted that his finding of significant concentrational limitation was not reflected by the treating records repeatedly showing a normal affect, mood, and full orientation (Tr. 41, 43, 525, 659, 666). She noted that in contrast to Plaintiff's unremarkable demeanor at the treating appointments, Plaintiff "appeared distant, suspicious, anxious, depressed," and tearful at her consultative appointment with Dr. Bray (Tr. 4).

On a related note, Plaintiff disputes the rejection of her own testimony of disabling physical and psychological limitation. However, the ALJ noted that the physical treating records showed a consistently normal gait and normal strength (Tr. 38-39). Further, the ALJ did not err in noting that the claims of disabling psychological limitation were undermined by Plaintiff's lack of mental health treatment (Tr. 41). *See Biestek v. Commissioner of Social Sec.*, 880 F.3d 778, 789 (6th Cir. 2017)(Claimant's allegations of limitation permissibly undercut by failure to seek aggressive treatment), *aff'd sub nom. Biestek*, *supra,* 139 S. Ct. 1148. The Court is mindful that "[f]or some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White v. Commissioner of Soc. Sec.,* 572 F.3d 272, 283 (6th Cir. 2009). However in the present case, Plaintiff received

routine treatment for physical conditions on a regular basis and was able to receive refills of psychotropic medication. The current record does not support the conclusion that she lacked the psychological capacity to seek and obtain appropriate mental health treatment.

Because the RFC composed by the ALJ is well explained, generously supported by the record, and well within the "zone of choice" accorded the administrative fact-finder, the non-disability determination should not be disturbed by this Court. *Mullen v. Bowen, supra.*

## **CONCLUSION**

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #18] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #13] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Any objections must be labeled as "Objection #1," "Objection #2," etc., and any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," *etc.*

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen<br>
R. STEVEN WHALEN<br>
UNITED STATES MAGISTRATE JUDGE

Dated: December 11, 2019

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on December 11, 2019, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla<br>
Case Manager to the<br>
Honorable R. Steven Whalen